CITY AND COUNTY OF DENVER, acting
By and Through its BOARD OF WA-
TER COMMISSIONERS, a/k/a City and
County of Denver Water Department,
Petitioner,

v.

Troy Orlando GALLEGOS, Respondent.

No. 95SC13.

Supreme Court of Colorado,
En Banc.

April 22, 1996.

As Modified on Denial of Rehearing
May 28, 1996.

Patricia L. Wells, General Counsel, Denver Water Board, Amy L. Moore, Hulbert E. Reichelt, Denver, for Petitioner.

Montgomery, Green, Jarvis, Kolodny & Markusson, P.C., Dennis H. Markusson, Joyce L. Jenkins, Denver, for Respondent.

Colorado Municipal League, David W. Broadwell, Denver, for Amicus Curiae Colorado Municipal League.

Hayes, Phillips & Maloney, P.C., Herbert C. Phillips, Denver, for Amicus Curiae City of Northglenn, Colorado.

Chief Justice VOLLACK delivered the Opinion of the Court.

We granted certiorari to review the court of appeals' decision in *Gallegos v. City and County of Denver*, 894 P.2d 14 (Colo.App. 1994). In reversing the trial court's judgment, the court of appeals broadly interpreted the term "public water facility," as set forth in the Governmental Immunity Act, §§ 24–10–101 to –120, 10A C.R.S. (1988 & 1995 Supp.) (the GIA), to include private property. We reverse the court of appeals and remand to the court of appeals with directions to reinstate the judgment for the City and County of Denver notwithstanding the jury verdict.

## I.

On May 7, 1991, Troy Gallegos (Gallegos) was visiting a friend on private property. As he was leaving, Gallegos stepped on a water meter pit lid which was located on the private property. The lid gave way and he fell into the meter pit, sustaining injuries that are the basis of this lawsuit. Prior to bringing this suit against the Denver Water Department (Denver), Gallegos settled with the property owners through their insurance company in the amount of $8,200.

The Denver Water Department is regulated by Operating Rules which were adopted by the Board of Water Commissioners. The Operating Rules provide that a landowner owns the water meter pit located on his property and is responsible for its maintenance. The Operating Rules further provide that the Denver Water Department controls the specifications, installation, and use of residential water meters and meter pits.

In Gallegos' claim against the Denver Water Department, he asserted that Denver was negligent in its use of the water meter pit which caused his injuries. At trial, the jury found Denver negligent and entered a verdict in favor of Gallegos. However, the trial court determined that the Denver Water Department was immune from liability pursuant to the GIA because the water meter pit was on private property. The trial court thus entered judgment for the Denver Water Department notwithstanding the verdict. However, the court of appeals, holding that the Denver Water Department was not immune from liability for Gallegos' injuries, reversed and ordered the trial court to enter judgment consistent with the jury verdict.

## II.

In 1971, we prospectively overruled our prior decisions that recognized the defense of sovereign or governmental immunity in tort actions. *Evans v. Board of County Comm'rs*, 174 Colo. 97, 105, 482 P.2d 968, 972 (1971); *see also Flournoy v. School Dist.*, 174 Colo. 110, 482 P.2d 966 (1971); *Proffitt v. State*, 174 Colo. 113, 482 P.2d 965 (1971). In response to our decisions abrogating governmental immunity, the General Assembly enacted the GIA, which controls the disposition of this case. *See* Ch. 323, sec. 1, §§ 130–11–1 to –17, 1971 Colo. Sess. Laws 1204, 1204–11; *Bertrand v. Board of County Comm'rs*, 872 P.2d 223, 226 (Colo.1994). The GIA restored sovereign and governmental immunity by statute, granting to state and local governments limited liability.

Because governmental immunity is in derogation of common law, legislative grants of immunity must be strictly construed. *Bertrand*, 872 P.2d at 226. Never-

theless, our primary task in construing a statute is to determine and give effect to the intent of the legislature. *State v. Hartsough*, 790 P.2d 836, 838 (Colo.1990). To discern legislative intent, we look first to the statutory language, giving words and phrases their plain and ordinary meaning. *Id.*

The GIA is intended to limit the liability of governmental entities, exposing them only to the liability specifically provided for in the Act. As stated in the GIA's declaration of policy:

> [Governmental entities] should be liable for their actions and those of their agents *only to such an extent* and subject to such conditions as are provided by this article.

§ 24–10–102, 10A C.R.S. (1988) (emphasis added). Therefore, the GIA requires that exceptions to governmental immunity be interpreted narrowly in order to avoid imposing liability not specifically provided for in the statute.

## III.

The GIA provision at issue, section 24–10–106(1)(f), 10A C.R.S. (1988), provides:

> Sovereign immunity is waived by a public entity in an action for injuries resulting from:
>
> . . . .
>
> (f) The operation and maintenance of any public water facility. . . .

§ 24–10–106(1)(f). In interpreting this exception to governmental immunity, we must resolve whether water meter pits are a public water facility. Additionally, we must determine whether the Denver Water Department engages in the operation and maintenance of water meter pits, as required for waiver of immunity.

## A.

Pursuant to section 24–10–106(1)(f), the Denver Water Department is liable in this case only if water meter pits are a public water facility. Neither the term "public water facility" nor "public facility" is defined by the GIA. Furthermore, there is no "ordinary meaning" for either phrase. The legislature, however, has recently defined the term "public facility" in a statutory provision entitled "Water Conservation Board and Compacts." §§ 37–60–101 to –130, 15 C.R.S. (1990 & 1995 Supp.). This provision states:

> "Public facility" means any facility operated by an instrument of government *for the benefit of the public* including, but not limited to, a governmental building, park or other recreational facility, school, college, university, or other educational institution, highway, hospital, or stadium.

§ 37–60–126(1)(b), 15 C.R.S. (1995 Supp.) (emphasis added). Hence, the determinative factor in defining a public facility is whether the facility is operated "for the benefit of the public."

Section 37–60–126(1)(b) states that the facility itself, not the government entity, must operate for the benefit of the public in order to qualify as a public facility. The statute then provides examples of public facilities, all of which have the common feature of being accessible and beneficial to members of the general public. These examples are distinguishable from water meter pits, which are used for the sole benefit of the property on which they are located and are not beneficial to the general public.

Nevertheless, Gallegos cites *Burnworth v. Adams County*, 826 P.2d 368 (Colo.App. 1991), for the proposition that water meter pits are a public water facility. *Burnworth*, however, is distinguishable from the current case because it involved a storm drain that had been relocated onto a landowner's property. The storm drain in that case was both operated and maintained by a county. *Burnworth*, 826 P.2d at 369. Furthermore, despite its location on private property, the storm drain was operated for the benefit of the general public, and not just for the benefit of the property on which it was located. The location of the storm drain on private property thus did not alter its benefit to the public.

■ In contrast, each water meter pit only benefits the property on which it is located. Therefore, although location is not determinative in defining public water facilities, the location of water meter pits is directly related to their lack of benefit to the public. Because water meter pits are not operated

for the benefit of the public, they are not public water facilities and the Denver Water Department is not liable for injuries caused by such meter pits.

### B.

■ In addition to Denver Water Department's immunity based on the fact that water meter pits are not a public water facility, Denver is also immune because it does not operate and maintain water meter pits. For purposes of immunity waiver, ownership of the water meter pits is not dispositive. Rather, the GIA only requires that a government be engaged in the operation and maintenance of a public water facility in order for immunity to be waived. It is thus necessary to determine whether the Denver Water Department operates and maintains water meter pits.

■ It is presumed that the legislature has knowledge of the legal import of the words it uses and that it intends each part of a statute to be given effect. *People v. Guenther,* 740 P.2d 971, 976 (Colo.1987). The legislative choice of language may be concluded to be a deliberate one calculated to obtain the result dictated by the plain meaning of the words. *Id.*

In section 24–10–106(1)(f), the legislature did not use the terms "maintenance" and "operation" loosely or interchangeably. The word "and" in this provision conclusively establishes that governmental immunity is waived only where the public entity both operates and maintains the public water facility. If the legislature had wished to use the term "or" instead of "and," it could have easily done so. For example, subsection (1)(b) of the same statute provides an exemption from immunity for the "operation," rather than the "operation and maintenance," of public hospitals, correctional facilities, or public jails. § 24–10–106(1)(b), 10A C.R.S. (1988). It can thus be concluded that, in drafting section 24–10–106(1)(f), the legislature intended for governmental entities to be liable only when they both operate and maintain a public water facility.

■ By the process of reading a meter, the Denver Water Department *operates* wa-

ter meter pits, as required by the exception to governmental immunity. However, the statute provides that the Denver Water Department must also *maintain* the water meter pit in order for it to be liable. Here, the Denver Water Department does not maintain water meter pits; it is not obligated to provide any type of upkeep for meter pits or lids. Instead, the Operating Rules clearly establish that the responsibility for maintaining water meter pits lies with the property owner. Because the exception to governmental immunity applies only if the Denver Water Department both operates and maintains water meter pits, and because Denver does not maintain water meter pits, Denver is immune from liability in this case.

### C.

Gallegos also argues that given the extent of regulation the Denver Water Department promulgates over water meter pits, it can be concluded that Denver Water Department exerts control over the water meter pit at issue in this case. Gallegos lists the various ways the Denver Water Department regulates water meter pits, asserting that the lengthy list justifies imposing liability on Denver for injuries caused by water meter pits.

■ The mere existence and enforcement of rules and standards cannot form the basis of liability, much less create attributes necessary for waiver of immunity under section 24–10–106(1)(f). *See Board of County Comm'rs v. Moreland,* 764 P.2d 812 (Colo. 1988); § 24–10–106.5, 10A C.R.S. (1988). To follow such reasoning to its illogical end, the existence and enforcement of elaborate building codes would make private residences and offices "public buildings" under section 24–10–106(1)(c), 10A C.R.S. (1988); and regulation of the location and operation of private hospitals would render them "public hospitals" under section 24–10–106(1)(b). Such a result was never intended by the legislature.

■ Similarly, the rules and standards delineated in the Operating Rules, merely because they regulate water meter pits, do not operate to make water meter pits a public facility. Such regulation of water meter pits

does not equate with the kind of control necessary to impose liability for injuries arising from the operation of public facilities. Rather, the control required by the GIA is that the public entity both operate and maintain the public facility at issue, as discussed above.

## IV.

We conclude that water meter pits found on private property are not public water facilities and that the court of appeals therefore improperly broadened the meaning of "public water facility" to include such water meter pits. We also hold that the Denver Water Department is immune from liability arising from injuries caused by water meter pits because the exception to governmental immunity only applies if Denver both operates and maintains water meter pits, and Denver does not maintain water meter pits. We therefore reverse the court of appeals and remand with directions to reinstate the trial court's judgment entered for the City and County of Denver notwithstanding the verdict.

SCOTT, J., dissents, and LOHR and MULLARKEY, JJ., join in the dissent.

Justice SCOTT, dissenting:

The Denver Water Department's [1] purpose is to provide water services to the citizens of Denver. This singular purpose necessitates its operation and maintenance of Denver's public water facility and involves the private property at issue in this case. Under the Colorado Governmental Immunity Act (GIA), "[s]overeign immunity is waived by a public entity ... for injuries resulting from" negligent conduct in "[t]he operation and maintenance of any public water facility." § 24–10–106(1)(f), 10A C.R.S. (1988). Before this court, the Denver Water Department concedes that reading a water meter falls within the meaning of "operation" under section 24–10–106(1)(f). The trial court below found that Denver Water Department's negligent handling of the water meter lid, after reading the water meter, led to Gallegos's injuries. Therefore, I am convinced that, under the GIA, Denver is liable for injuries caused by its employee's negligence in reading the water meter. Moreover, unlike the majority, I believe title and ownership are extraneous and superfluous when determining liability for negligent acts or omissions of a public entity or public employee acting within the scope of employment.

The Denver Water Department regulates the nature, installation, and use of residential water meters and meter pits, including the meter pit and cover plate.[2] Denver Water Department employees have unlimited access to water meter pits despite the fact they are considered private property. Although title rests with the land owner, Denver employees access water meter pits for purposes of operation and maintenance of the Denver "public water facility." Gallegos's injuries resulted from an act or omission of a Denver Water Department employee in the exercise and performance of the employee's duties with respect to the operation and maintenance of the Denver "public water facility." As a consequence, immunity is waived. Denver must therefore bear the burdens and responsibilities of its actions, as imposed by the GIA. Accordingly, because I would affirm the judgment of the court of appeals, I dissent.

## I. Facts

### A.

The Denver Water Department and its employees are under the control of a Board of Water Commissioners (the "Board").[3]

---

1. The defendant below and the petitioner before us is the City and County of Denver. In the complaint and pleadings, it is denominated as the "City and County of Denver, acting by and through its Board of Water Commissioners, a/k/a City and County of Denver Water Department." Hereafter for stylistic purposes I shall refer to the petitioner as "Denver" or the "Denver Water Department." I have relied upon the record, including the pleadings, for my recitation of the facts.

2. Unless otherwise specified, references to the "water meter pit" shall include the water meter pit, water meter, the cover plate or outer lid, and the frost plate or inner lid, collectively.

3. Under the Charter of the City and County of Denver, the Board was established to provide water services within the city. The Board has "complete charge and control of a water works system and plant for supplying the City ... with water for all uses and purposes." Art. IV, Chap-

The Board has adopted a comprehensive set of regulations (the "Operating Rules") for the Denver Water Department. The Operating Rules dictate the specifications, installation, and use of residential water meters and meter pits, including the meter pit and cover plate.

A former Denver Water Department employee testified that (1) meter maintenance is the responsibility of the Water Department; (2) notice from the Department triggers the financial responsibility of the owner for maintenance of the water meter pit; and (3) land owners do not make repairs because repairs are part of the maintenance performed by the Denver Water Department or department approved plumbers.

A water meter pit houses the water meter each land owner is required to provide in order to receive water services from the Denver Water Department. The Denver Water Department has unlimited access to each water meter pit and its water meter, both of which must be constructed and installed in accordance with the Operating Rules.

The Operating Rules require citizens to purchase and install water meters so that the Denver Water Department can charge citizens the appropriate water use fee. Additionally, water meters provide the Denver Water Department with a means by which it can regulate water consumption for both billing and conservation purposes. Therefore, citizens are required to allow Water Department employees unlimited access to water meter pits.

In order to read the water meter or to facilitate maintenance, a Denver Water Department employee must free or unscrew a lock nut and must also remove the cover plate and the frost plate. After accessing the meter, the employee must return both the frost plate and cover plate. To properly

secure the cover plate, the employee must tighten the lock nut.

### B.

In January 1991, the subject water meter froze, and as a consequence, the Denver Water Department replaced it. On March 15, 1991, less than two months before Gallegos's fall, a Denver Water Department employee accessed the water meter pit to read the meter. There is no evidence in the record that anyone other than a Denver Water Department employee had removed the cover plate or had accessed the water meter pit from the time the meter was last read to the time of Gallegos's fall. Several witnesses testified that the frost plate was not in place at the time of Gallegos's accident. It was uncontroverted that the land owners had no cause to access the water meter pit or to handle the cover plate, particularly between the time of the last reading and the accident.

### II.  Limits of Governmental Immunity [4]

In 1971, we prospectively overruled our prior decisions that recognized the defense in tort actions of governmental immunity. *Evans v. Board of County Comm'rs*, 174 Colo. 97, 105, 482 P.2d 968, 972 (1971); *see also Flournoy v. School Dist.*, 174 Colo. 110, 482 P.2d 966 (1971); *Proffitt v. State*, 174 Colo. 113, 482 P.2d 965 (1971). In response to our decisions abrogating governmental immunity, the General Assembly enacted the GIA. *See* Ch. 323, sec. 1, §§ 130–11–1 to –17, 1971 Colo. Sess. Laws 1204, 1204–11; *Bertrand v. Board of County Comm'rs*, 872 P.2d 223, 226 (Colo.1994).

In *Stephen v. City & County of Denver*, 659 P.2d 666 (Colo.1983), we first noted that, because governmental immunity is in derogation of Colorado's common law, "legislative grants of immunity must be strictly construed." *Id.* at 668 n. 3; *Bertrand*, 872 P.2d at 226. Our construction of statutory excep-

---

ter C, § C4.14, Denver Charter. The Board meets its responsibilities through the Denver Water Department.

4. We have previously noted that "sovereign immunity" generally refers to the immunity of the state or federal government, while "governmental immunity" refers to immunity existing in all

levels of government. *Bertrand v. Board of County Comm'rs*, 872 P.2d 223, 224 n. 1 (citing W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on the Law of Torts*, § 131, at 1033 (5th ed.1984)). Consistent with that distinction, I shall refer to the immunity at issue here as governmental immunity.

tions to immunity should be applied so as to be "compatible with, and supported by, our prior conclusion that the GIA, being in derogation of the common law, is to be strictly construed," *Bertrand,* 872 P.2d at 229; thus, as a logical corollary, exceptions to governmental immunity should be broadly construed.

The majority's reading of the GIA, however, is inconsistent with this precedent and our prior statement of the law. The majority's interpretation of the GIA treats provisions granting immunity as if immunity was, in fact, the common law. Hence, the majority reads grants of immunity broadly, rather than narrowly. The majority, for example, ignores a significant portion of the Declaration of Policy in section 24–10–102, 10A C.R.S. (1988), which states in relevant part:

> The general assembly ... recognizes that the supreme court has abrogated the doctrine of sovereign immunity ... and that thereafter the doctrine shall be recognized only to such extent as may be provided by statute.

### III. Public Water Facility

Section 24–10–106(1)(f), 10A C.R.S. (1988) provides in relevant part:

> **Immunity and partial waiver.** (1) A public entity shall be immune from liability in all claims for injury which lie in tort or could lie in tort regardless of whether that may be the type of action or the form of relief chosen by the claimant except as provided otherwise in this section. Sovereign immunity is waived by a public entity in an action for injuries resulting from:
>
> . . . .
>
> (f) The *operation and maintenance of any public water facility* ... by such public entity.

(Emphasis added.)

The majority holds that if a water meter pit is located on private property, it is not a "public water facility." *See* maj. op. at ——. However, the plain language of section 24–10–106 does not recognize the distinction that the majority finds controlling. I disagree for at least two reasons. First, the plain language of the controlling statute does not permit a determination of immunity based upon title to property. Neither section 24–10–106 nor the GIA draw a distinction between immunity and the waiver of immunity based on whether the negligent conduct of the governmental actor occurs on public or private property. Second, even under the Operating Rules, private property that is under the control of the Denver Water Department is considered part of the Denver "water system."

### A. Public and Private Property

The plain language of section 24–10–106(1)(f) does not draw a distinction based on ownership or legal title; thus, contrary to the majority's holding, a water meter's location on private property is not dispositive of whether negligent conduct of water department employees occurs or does not occur in the exercise and performance of duties related to the "operation" or "maintenance" of a "public water facility."

In *Burnworth v. Adams County,* 826 P.2d 368 (Colo.App.1991), *cert. denied,* (Colo. March 10, 1992), the court of appeals reasoned that if the General Assembly intended to extend the grant of governmental immunity to prevent liability for negligent conduct on a land owner's property, it would have further amended the act "at that time or in subsequent sessions of the General Assembly." *Id.* at 370. Rather, for purposes of immunity waiver, the GIA only requires that a government be engaged in the "operation and maintenance of any public water facility." § 24–10–106(1)(f).

The result of the majority's holding would limit "injuries resulting from ... [t]he operation and maintenance of any public water facility" to conduct occurring on government property. This can only lead to an unfortunate and absurd result: granting immunity under circumstances where Denver employees are most likely to encounter citizens, while recognizing a waiver of immunity only for acts committed on property owned by the Denver Water Department where employees are most unlikely to encounter or cause injury to citizens.

A second consequence of the majority's rationale is that in some cases the Denver Water Department will have immunity, while in other cases, due to ownership of the water meters, Denver will be liable. Under the Operating Rules, effective January 1, 1991, all flat rate customers subscribing to Denver Water are to be converted to meter status. While the Denver Water Department converts from flat rate to metered services, the ownership of meters will vary, some installed by land owners and some installed by the Denver Water Department. Chapter 9 Meters, Rule 9.01 of the Operating Rules states:

> 9.01 *Ownership.* Meters which are read for billing purposes by the Water Department shall be owned by, and installed at the expense of, the licensee of the premises served by such meters, except as hereinafter provided and *except that the Board shall install meters at its own expense to convert flat rate services to metered services pursuant to 2.026 and shall own the meters so installed.*

(Emphasis added.)

The conversion process will cause differences in title to meters among citizens in the same neighborhood. Waiving sovereign immunity for Denver Water Department owned meters and not for land owner meters installed prior to 1991 would lead to incongruous and inconsistent results. That is, for meters installed by Denver after 1991, Denver will have waived immunity, while for meters similarly installed prior to 1991, Denver is granted immunity by the majority.

### B. Maintenance and Operation

Section 24–10–103(3)(a), 10A C.R.S. (1988), defines "operation" as, "the act or omission of a public entity or public employee in the exercise and performance of the powers, duties, and functions vested in them by law with respect to the purposes of any ... public water ... facility." "Denver Water Department concedes that the process of reading a meter in a meter pit may rise to the level of 'operation' of that meter pit." (Petitioner's Opening Brief at 11.) Here,

Gallegos alleged that the department's employees negligently failed to replace the cover or lid of the subject water meter pit after reading the meter. The Denver Water Department controls the nature of the water meter and, for all practical purposes, has exclusive control over the use and maintenance of the water meter pit under its Operating Rules. Thus, as contemplated by the statute, the Denver Water Department may be held accountable for the negligent acts of its employees in the "operation and maintenance" of its water system, including actions of its employees for the purpose of reading water meters. Furthermore, a retired employee of the Denver Water Department testified "that the Water Department maintains the meter in the bottom of the pit." Thus, in light of Denver's acknowledged operation and maintenance of the subject pit, I conclude that the subject water meter pit comes within the definition of "public water facility" as set forth in the GIA.

### C. Control

Denver Water Department's own Operating Rules define its "water system" as "[t]he plant, facilities, system and assets, controlled by the Board pursuant to its Charter authority." Thus, under the Operating Rules, themselves, the pivotal element in establishing an ownership interest in the subject pit and lid is neither title nor location; but rather, control. Given the extent of the regulations Denver Water Department promulgates over water meter pits, Denver Water Department exerts control over a system, which by its own Operating Rules, incorporates the water meter pit at issue in this case.

Denver Water Department requires land owners to purchase and install water meters according to Denver Water Department's detailed regulations. The Operating Rules compel the land owner to purchase and install a water meter, which Denver Water Department must approve.[5] The Operating Rules further require the land owner to use only Denver Water Department approved plumbers. Denver Water Department pro-

---

5. As set forth in Operating Rule 9.01, *supra,* today Denver "install[s] meters at its own expense" and, "own[s] the meters so installed."

Therefore, under the majority's reasoning, immunity is waived for Denver owned water meters.

mulgates detailed specifications for water meter pits setting forth, *inter alia,* requirements for design, size, location, construction, plumbing, and dimensions. Operating Rules 9.05 and 9.051a provide:

> *Location.* All meters must be located so as to allow free and non-hazardous access at reasonable times for reading, removal, inspection and replacement, and so that the entire supply of water to the premises will at all times be accurately measured. If, at any time, an existing meter location does not conform to the standards enumerated in this section, such installation shall be modified so that it does conform. A remote reading device must be installed when such device is reasonably necessary to eliminate reading estimates.

> The specific location of meters installed at customer expense shall be designated by the customer, subject to the approval of the Water Department. Two meter locations which are acceptable to the Water Department are:

> (1) in a frost proof meter pit or vault within the boundaries of a public street·or not more than 5 feet from the property line and adequately protected from the hazards that may surround it. . . .

Operating Rule 6.04 provides that "[t]he maintenance and protection of privately owned piping, . . . *except meters* whether located in or upon public or private property is the exclusive responsibility of the owner thereof. . . ." (Emphasis added.)

The thoroughness of Denver Water Department's regulations, its unlimited access to the land owners' property in order to read the meter, and its unlimited control over water meters causes otherwise private property to be part of the Denver public water system. Hence, if only for the limited purpose of the GIA, the water meter pit, whether title rests with the land owner or after 1991 with Denver, is *part of a "public water facility."*

Liability predicated on control is consistent with our precedent in *Burnworth,* 826 P.2d at 368. In *Burnworth,* the court of appeals held that a· storm drain, which a governmental entity relocated onto a land owner's property, was deemed to be part of a "sanitation facility" within the meaning of the GIA's immunity waiver. *Id.* at 370. The drain was still construed to be a public facility despite its location on private property. Moreover, liability was imposed based upon Adams County's operation and maintenance of the sanitation facility, notwithstanding ownership or location. *See id.* Thus, control of the property, not its location or title, determined whether a public entity was engaged in the operation and maintenance of a public facility.

### IV. Public Benefit

Under the plain language of the GIA, governmental immunity is waived only if the activity at issue relates to the facility's purpose. "Public water facility" is not defined in the GIA. However, the legislature has defined the term "public facility" in the "Water Conservation Board and Compacts" of the Colorado Revised Statutes, sections 37–60–101 to –130, 15 C.R.S. (1990 & 1995 Supp.):

> (b) "Public facility" means *any facility operated by an instrument of government for the benefit of the public* including, but not limited to, a government building, park or other recreational facility, school, college, university, or other educational institution, highway, hospital, or stadium.

§ 37–60–126(1)(b), 15 C.R.S. (1995 Supp.) (emphasis added); *see also Pack v. Arkansas Valley Correctional Facility,* 894 P.2d 34, 37 (Colo.App.1995) ("[T]he maintenance of visitor parking areas in order to facilitate prison visitation is not directly related to the purpose, as distinct from the operation, of a correctional facility.").

The majority states that water meter pits are not ·part of a "public facility" because "each water meter only benefits the property on which it is located." Maj. op. at ——. The majority's reasoning, however, incorrectly focuses upon the water meter pit. As a result, the majority ignores the Denver water system and oversimplifies the purpose of water meters as well as their role in an entire water services system.

The Denver Water Department, in supplying water to consumers, operates its entire water system for the benefit of the public.

*Millis v. Board of County Comm'rs,* 626 P.2d 652, 659 (Colo.1981); *Colorado Open Space Council Inc. v. City & County of Denver,* 190 Colo. 122, 124, 543 P.2d 1258, 1260 (1975). By supplying water to residents and land owners within Denver's borders, the Denver Water Department operates its water system for the benefit and general welfare of the public, rather than for the sole benefit of individual water users. Water meter pits are essential elements in supplying citizens with water services, and the Denver Water Department utilizes them for the benefit of the city at large.

The water meter pit does not exist at the behest of the land owner. Rather, Denver Water Department mandates the water meter pit for regulatory purposes directly related to the public service it provides. Of necessity, Denver Water Department must access the water meter pit in order to read the water meter so that it can regulate the water services it provides to the land owner. By measuring the amount of water provided, water meters play an important role in the Denver Water Department's ability to regulate water services.

The court of appeals noted, and it is undisputed, that the Denver Water Department utilizes a metering system for recording water usage in order to charge and collect sums that land owners or residents of the affected property owe for the water services provided. *Gallegos v. City & County of Denver,* 894 P.2d 14, 17 (Colo.App.1994). For example, by measuring the use of each individual recipient, Denver can charge customers based on consumption. By doing so, citizens are encouraged to control consumption and conserve—thus benefitting the city and all its residents. Moreover, by measuring consumption, the Denver Water Department can make important policy determinations such as imposing voluntary or involuntary water use restrictions.

The majority suggests that the water meter pit is not a "public water facility." *See* maj. op. at ——–——. However, Gallegos has not argued nor has the court of appeals held that the water meter pit *itself,* is a public water facility. Instead, by recognizing Denver's control over the water meter pit

and the purpose or function of water meters, the court of appeals determined the water meter pit is *part* of a public water facility.

The majority's attempt to have us focus solely upon the water meter pit, alone, begs the question and ignores the import of the statute's intended reach.

## V. Privatization and Cost Shifting

Although the Operating Rules articulate land owners' duties and responsibilities, given the extent of Denver Water's regulations, the Operating Rules only shift the cost of certain Denver Water Department activities to land owners. The Operating Rules transfer neither control nor maintenance responsibility for the water meter pit from Denver Water to land owners.

To recognize governmental immunity here, as the majority suggests, would enable government entities to avoid responsibility for their negligence by merely delegating or subcontracting certain activities to private parties, or transferring title to equipment or property by rule or regulation to private parties. Similarly, by essentially shifting the cost of some of its activities through its Operating Rules, the Denver Water Department should not be excused from the negligent operation or maintenance of property within its control.

## VI. Conclusion

Denver Water Department may not be excused from liability for negligence in its operation and maintenance of property under its control, especially when such conduct arises out of its "operation and maintenance of [a] public water facility." Whether the activities of Denver Water Department employees occur on private property or Denver Water Department sites, section 24–10–106(1)(f) waives immunity for negligent conduct that is directly related to the performance or execution of duties or responsibilities of Denver employees. The touchstone of the instant liability inquiry is whether the negligent conduct arises out of duties or functions that relate to the "operation and maintenance" of the Denver public water facility and not title to the property or instru-

mentality that is the vector of the negligent conduct. Unlike the majority, therefore, I conclude that, consistent with the plain language of section 24–10–106(1)(f) of the GIA, the negligent conduct of water department employees when accessing water meter pits, though privately owned, may result in a waiver of immunity if the conduct occurs in connection with the Water Department's "operation and maintenance of [a] public water facility." Thus, I would affirm the judgment of the court of appeals and return this case to that court for remand to the trial court with directions to reinstate the jury's verdict.

I am authorized to say that Justice LOHR and Justice MULLARKEY join in this dissent.