Concerning the Application for Water Rights of the Mount Emmons Mining Company, an affiliate of Climax Molybdenum Company, in the Slate River, Carbon Creek, and Elk Creek, All Tributaries to the Gunnison River, in Gunnison County.

MOUNT EMMONS MINING COMPANY, Applicant–Appellant,

v.

TOWN OF CRESTED BUTTE; Western Slope Environmental Council; High Country Citizens' Alliance; Board of County Commissioners of Gunnison County, Colorado; Rosalie C. Munis; Albert W. Sanderson; William S. Sanderson; A.B. Herndon, Jr. and June G. Herndon; John Evans and Betty Evans; the Ranches at Ohio Creek, LLC; Cheri–Colleen Campbell–Raferty; Mary J. Turner; The Colorado Water Conservation Board; Dr. B. Henry Estess; Crested Butte Mountain Resort, Inc.; Castle Creek Cattle Corp.; Castleton Ranch Company; Eagle Ridge Ranch Homeowners Association; Bert A. Guerrieri; Richard E. Guerrieri and Phyllis C. Guerrieri; Wallace A. Jones and Marry M. Jones; The Ochs Brothers Partnership; Harrison F. Russell and Patricia E. Russell; E. Allan Stockton and Barbara V. Stockton; John L. Walsh and Agnes Ann Walsh; The City of Gunnison; E.J. Maurer; The Board of County Commissioners of Arapahoe County; The United States (Bureau of Land Management and United States Forest Service); Crested Butte Land Trust; Earl Partch; Francis Partch; Carl E. Silka; Dan Rundell; Phyllis Rundell; Debe Hancock; Star Mountain Ranch

Association, Inc.; and Scott Rennck, Opposers–Appellees,

and

Wayne I. Schieldt, Division Engineer, Water Division No. 4., Appellee pursuant to C.A.R. 1(e).

No. 99SA354.

Supreme Court of Colorado, En Banc.

Jan. 28, 2002.

Rehearing Denied Feb. 25, 2002.

Friedlob Sanderson Paulson & Tourtillott, LLC, Brian M. Nazarenus, Carolyn F. Burr, Denver, CO, Attorneys for Applicant–Appellant.

Laura L. Magner, Crested Butte, CO, Frascona, Joiner, Goodman, and Greenstein, P.C., Joseph Adams Cope, Boulder, CO, Attorneys for Opposer–Appellee Town of Crested Butte.

Land and Water Fund of the Rockies, Bruce C. Driver, Bart P. Miller, Boulder, CO, Attorneys for Opposers–Appellees Western Slope Environmental Resource Council and High Country Citizens' Alliance.

David Baumgarten, Gunnison, CO, Attorney for Opposer–Appellee Board of County Commissioners of Gunnison County, CO.

Ken Salazar, Attorney General, Steven O. Sims, First Assistant Attorney General, Linda J. Bassi, Assistant Attorney General, Natural Resources and Environment Section, Denver, CO, Attorneys for State and Division Engineer.

No appearance by or on behalf of Rosalie C. Munis; Albert W. Sanderson; William S. Sanderson; A.B. Herndon, Jr. and June G. Herndon; John Evans and Betty Evans; The Ranches At Ohio Creek, LLC; Cheri-Colleen Campbell–Raferty; Mary J. Turner; The Colorado Water Conservation Board; Dr. B. Henry Estess; Crested Butte Mountain Resort, Inc.; Castle Creek Cattle Corp.; Castleton Ranch Company; Eagle Ridge Ranch Homeowners Association; Bert A. Guerrieri; Richard E. Guerrieri and Phyllis C. Guerrieri; Wallace A. Jones and Marry M. Jones; The Ochs Brothers Partnership; Harrison F. Russell and Patricia E. Russell; E. Allan Stockton and Barbara V. Stockton; John L. Walsh and Agnes Ann Walsh; The City Of Gunnison; E.J. Maurer; The Board Of County Commissioners Of Arapahoe County; The United States (Bureau Of Land Management And United States Forest Service); Crested Butte Land Trust; Earl Partch; Francis Partch; Carl E. Silka; Dan Rundell; Phyllis Rundell; Debe Hancock; Star Mountain Ranch Association, Inc.; and Scott Rennck.

Justice KOURLIS delivered the Opinion of the Court.

Mount Emmons Mining Company (Applicant) applied for a conditional water right to operate a molybdenum mine in Gunnison

County. The water court denied the application, finding that Applicant failed to establish sufficient water availability to support a conditional decree. The water court based its denial upon an earlier ruling out of the same Water Division that affected the Gunnison River basin. The earlier order found 60,000 acre-feet of water available for in-basin users such as Applicant, but also found that a contract was necessary to access that water. We now hold that such a user-specific contract is not necessary for Applicant to make the requisite showing of water availability to support the issuance of a conditional decree. Accordingly, we reverse the water court ruling and remand the case for further proceedings consistent with this opinion.

## I.

In 1998, Applicant filed a conditional water right application in connection with its proposed molybdenum mine near Crested Butte, Colorado. The application contemplated consumptive use of 1,500 acre-feet of water per year, taken from the Slate River and Carbon Creek, both tributaries of the Gunnison River above the Aspinall Unit (Unit).

The Unit, originally called the Curecanti Unit, is a series of three Colorado River Storage Project Act reservoirs located on the main stem of the Gunnison River. The reservoirs, Blue Mesa, Morrow Point, and Crystal, are together capable of storing 1,090,000 acre-feet of water. The decrees for the Unit were made absolute in 1980, with 1957 priority dates.[1]

The United States Government (acting through the Bureau of Reclamation, "BUREC") is the holder of the water rights in the Unit, having received them by grant from the Colorado River Water Conservation District (River District).

The Aspinall Unit water rights are generally subject to Colorado law and are further specifically subject to a subordination obligation. The River District assigned the state adjudicated water rights for the Unit to the BUREC on the condition that in-basin

projects on the Gunnison and its tributaries above the Unit could deplete at least 60,000 acre-feet of water. This obligation was an outgrowth of negotiations between the River District, local interests, the United States, and the Colorado Water Conservation Board to accommodate development of water resources in the natural basin of the Gunnison River. The water court has found, and this court has confirmed, that such understanding resulted in a binding, enforceable agreement. *Bd. of County Comm'rs v. Crystal Creek Homeowners' Ass'n*, 14 P.3d 325, 340–41, 346 (Colo.2000) (*Arapahoe II*). The effect of the subordination is to make water available for appropriation that BUREC could otherwise call for the Unit in the exercise of its absolute water rights.

Thus, the question before us today is simply whether a junior, up-stream, in-basin appropriator must have a contract with BUREC in order to take advantage of the subordination policy. The water court agreed with the Objectors in this case that, in order to meet the required showing of water availability for issuance of a conditional decree, Applicant must produce a contract with BUREC that permits Applicant to take advantage of the subordination policy. We disagree.

## II.

Colorado cherishes its water as a scarce and valuable resource. *State Eng'r v. Castle Meadows, Inc.*, 856 P.2d 496, 505 (Colo.1993). The State strives to distribute the resource in ways that respect historical uses without thwarting growth or entrepreneurial development. One of the cornerstones of this state's water policy is that the resource be administered to maximize its beneficial uses. *See* § 37–92–102, 10 C.R.S. (2001).

 An applicant may commence the process of developing a beneficial use by filing for a conditional right, defined by statute as "a right to perfect a water right with a certain priority upon the completion with reasonable diligence of the appropriation."

---

1. For a thorough discussion of the Unit, the 1922 Colorado River Compact, and their effect on conditional water rights applications in the Gunnison Basin, see *Board of County Commissioners v. Crystal Creek Homeowners' Ass'n*, 14 P.3d 325 (Colo.2000).

§ 37–92–103(6), 10 C.R.S. (2001). A conditional right is a right that serves to hold the place of the appropriator in the "first in time, first in right" system in effect in Colorado. If the appropriator diligently puts the water to beneficial use, the conditional right can mature into an "absolute" water right, with a priority that dates back to the initiation of the conditional right. *Bd. of County Comm'rs v. United States,* 891 P.2d 952, 970 (Colo.1995) (*Arapahoe I* ).

■ The elements required to establish a conditional right are:

> [A]n applicant must show in general that a "first step" toward the appropriation of a certain amount of water has been taken, that the applicant's intent to appropriate is not based upon the speculative sale or transfer of the appropriative rights, and that there is a substantial probability that the applicant *can and will* complete the appropriation with diligence.

*City of Thornton v. Bijou Irrigation Co.,* 926 P.2d 1, 31 (Colo.1996) (emphasis added). The "can and will" reference above is from a 1979 addition to section 37–92–305(9)(b), 10 C.R.S. (2001) ("No claim for a conditional water right may be recognized ... except to the extent that it is established that the waters can be and will be diverted, stored, or otherwise captured, possessed, and controlled and will be beneficially used....").

■ In *In re Water Rights of Hines Highlands Ltd. Partnership,* 929 P.2d 718 (Colo. 1996), the applicant sought a conditional decree for water rights for a ski area development plan. *Id.* at 721. The objectors argued that there was insufficient water available in Maroon Creek to permit the diversions under the proposed junior conditional rights. *Id.* at 723. We held that:

> Under the can and will statute, the applicant must make a threshold showing of reasonable availability of water to prove that the applicant "can" complete the appropriation....
>
> ... The applicant need only prove that there is a substantial probability that the appropriation can and will be completed, based upon necessarily imperfect predictions of future conditions. This approach

to obtaining a conditional water right decree promotes the development and maximum utilization of Colorado's scarce water resources.

*Id.* at 723–24 (citation omitted). Thus, as a prerequisite to receiving a conditional decree, applicants must show water is available that can be diverted. *See also Arapahoe II,* 14 P.3d at 333 ("[A]pplicant must prove ... that the river contains sufficient unappropriated water for the applicant to complete the appropriation diligently and in a timely manner.").

### III.

■ With that precedent in mind, we now turn to the question of whether water is available in the Gunnison River basin for purposes of Applicant's conditional water right application. All parties agree that Applicant is invoking the 60,000 acre-foot depletion allowance. All parties also agree that Applicant is an up-stream, junior, in-basin appropriator who qualifies under the subordination agreement in which the River District conveyed its rights for the Unit to the United States. However, the Objectors take the position that Applicant needs a specific contract with BUREC identifying it as a beneficiary of the subordination agreement.

In order to analyze the respective rights and obligations of the parties to this controversy, we must first define the nature of the subordination agreement and the depletion allowance. "Subordination" is a real estate concept defined as "[t]he act or process by which a person's rights or claims are ranked below those of others." *Black's Law Dictionary* 1426 (7th ed.1999). It is most often used in the context of one lien or mortgage holder agreeing to subordinate its senior interest to the rights of a junior lien or mortgage holder. Subordination, as other courts have noted, is essentially a matter of status between parties. *See Brown v. Boren,* 74 Cal.App.4th 1303, 88 Cal.Rptr.2d 758, 765 (1999); *see generally In re Am. Sweeteners, Inc.,* 248 B.R. 271 (Bkrtcy.E.D.Pa.2000). It establishes priorities between those parties by some means other than the automatic or statutory scheme. *Brown,* 88 Cal.Rptr.2d at 765.

We have held previously that BUREC must subordinate its senior rights to at least 60,000 acre-feet of upstream, junior, in-basin depletions for beneficial use, and that there is an agreement to that effect that supercedes the Unit's water rights. *Arapahoe II,* 14 P.3d at 340–41. Thus, the agreement establishing the priorities and creating the depletion allowance is the umbrella agreement that was a part of the transfer of the water rights to BUREC.

Depletion allowance is something of an inapposite term, if given its traditional meaning;[2] however, here it clearly refers to the amount of water available for use by upstream, in-basin users who would otherwise be subject to the Unit's call for administration and curtailment. Therefore, the depletion allowance represents the total amount of water that BUREC agreed could supercede the exercise of its senior rights through the subordination.

In the case before us, Judge Steven Patrick relied on Judge Robert Brown's findings in *Arapahoe II* when he concluded that potential appropriators, like Applicant, may access the 60,000 acre-foot depletion allowance for purposes of a conditional decree *only if* they possess a contract with BUREC. Because Applicant possessed no such contract, Judge Patrick denied the application based upon a failure to demonstrate water availability. We observe, however, that Judge Brown's factual conclusions in *Arapahoe II* addressed the issue of whether the Board of County Commissioners of Arapahoe County could access the depletion allowance for purposes of showing water availability for the Union Park Project trans-mountain diversion. Judge Brown concluded that Arapahoe County could not make use of the 60,000 acre-foot depletion allowance for a trans-mountain diversion project, and such a limitation on the subordination was not an impermissible selective subordination. We upheld this conclusion. *Arapahoe II,* 14 P.3d at 345–46. Judge Brown also concluded that Arapahoe County needed, but did not have, an agreement with BUREC for its proposed

water use and decreed that the depletion allowance did not make water available for Arapahoe's use in the Union Park project. Although we affirmed Judge Brown's primary ruling in *Arapahoe II,* we did not opine on the method of implementation or administration of the 60,000 acre-feet, because the issue was not before us in that case given our ruling on Arapahoe County's legal impediment as a trans-basin diverter.

In rendering his conclusion, Judge Brown cited extensively from witness testimony of several members of BUREC, the Water Districts involved, as well as the State Engineer's office. He detailed development of the subordination policy. Ultimately, he concluded that it was the intent of the parties (the River District and BUREC) to condition the grant of water rights for the Unit upon the creation of a 60,000 acre-foot depletion allowance, but that "to implement the subordination (depletion) policy," the parties contemplated contracts. Thus, according to Judge Brown in *Arapahoe II,* the parties intended that contracts be in place to effectuate the depletion. This illustrates one of the problems in using factual findings generated in one case as dispositive in another case. Judge Brown based his finding that user-specific contracts were necessary primarily on the testimony of Carol DeAngelis. However, Wayne Cook, also from BUREC, refuted her testimony on the necessity of a contract. Both individuals were "knowledgeable BUREC officials." Judge Brown chose not to give as much credence to Mr. Cook's testimony because Cook not only testified that no contract was necessary, but also that trans-basin diverters could make use of the depletion allowance—a conclusion Judge Brown found to be refuted by the weight of the evidence. Thus, although Judge Brown did find that a user-specific contract was necessary, his finding was in the context of a case involving a trans-basin diverter, where the real issue focused on the in-basin limitations of the subordination agreement.

■ In this regard, we disapprove of the use of Judge Brown's findings as determina-

---

**2.** A depletion allowance in the natural resources mineral industry is "[t]he process by which the cost or other basis of a natural resource (e.g., an oil and gas interest) is recovered upon extraction and sale of the resource." *Black's Law Dictionary* 437 (7th ed.1999).

tive in this case because, here, the conditional water right applicant is an in-basin appropriator. The existence of the subordination agreement has been firmly recognized in our case law, and this appropriator is within the group of individuals and entities for whom the depletion was intended from the outset of the Unit's development by the United States. Our prior cases clearly hold that at least 60,000 acre-feet of water is available for appropriation to in-basin beneficiaries such as Applicant.[3] *See Arapahoe II*, 14 P.3d at 346. Water within the depletion allowance is, therefore, as a matter of law, available to this applicant for the purposes of a conditional decree—provided only that other qualified appropriators have not otherwise exhausted the depletion allowance.

 Typically, to satisfy the "can and will" test, new appropriators must convince the water court that their diversion will cause no harm to senior appropriators: i.e., that water is available. *See Southeastern Colo. Water Dist. v. City of Florence*, 688 P.2d 715, 718 (Colo.1984); *Empire Lodge Homeowners' Ass'n v. Moyer*, 39 P.3d 1139, 1147–49 (Colo.2001). In the Gunnison basin, however, to satisfy the water availability test, a new, in-basin appropriator must only convince the water court that a portion of the 60,000 acre-foot depletion allowance remains unused. Because we have already determined that this amount was made available for in-basin users, the remaining question for the water court is only what amount, if any, of the 60,000 acre-feet remains. This in turn depends on the exercise of absolute decrees for in-basin, junior uses above the Unit. *Arapahoe I*, 891 P.2d at 962. We hold that the absence of a contract between Applicant and BUREC does not preclude satisfaction of the "water availability" test of the "can and will" doctrine.

## IV.

The trial judge here required Applicant to satisfy an unnecessary prerequisite before it could receive a conditional decree. Without reaching the question of whether some sort of BUREC contract may be required in connection with operation of the applicant's water right, we reverse the water court's denial of Mount Emmons' application and remand this case to the water court to determine whether a sufficient amount of the 60,000 acre-foot depletion allowance remains unappropriated to satisfy the application for a conditional decree.

---

3. We express no opinion on whether BUREC may require a master agreement that, among other provisions, might contemplate accounting and reporting requirements relevant to Unit operations and State Engineer administration in the event Applicant puts the water to beneficial use.